# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|   |   |   |
|---|---|---|
| BANK OF AMERICA, N.A., | * |   |
| Plaintiff, | * | Case No. PX 15-02953 |
| v. | * |   |
|   | * |   |
| JERICHO BAPTIST CHURCH MINISTRIES, INC. *et al.*, | * |   |
| Defendants. | * |   |

******

## MEMORANDUM OPINION

Currently pending and ripe for resolution are the parties' cross-motions for summary judgment. ECF Nos. 188, 189. The issues have been fully briefed, and the Court held a hearing on February 5, 2019. For the reasons articulated below, the Court GRANTS in part and DENIES in part Counter-Defendant Bank of America's ("BOA") motion and DENIES Counter-Plaintiff Jericho Baptist Church Ministries' ("Jericho D.C.") motion.

## I. Background

### A. Procedural History

This case originated as an interpleader action filed by BOA seeking Court determination of who rightfully owns the funds held in various BOA accounts. At the center of this case is the longstanding dispute over the control and governance of Jericho Baptist Church Ministries, Inc. ("the Church"), located in Landover, Prince George's County, Maryland. BOA asked this Court to determine which of two warring Church factions, Jericho D.C. or Jericho M.D., rightfully owned account funds held in the name of the Church. In the same action, Jericho D.C. filed

three counterclaims against BOA for breach of contract, negligence and gross negligence. ECF Nos. 19, 48.

As to the initial interpleader action, the Court determined that Jericho D.C. was the rightful owner of the BOA account funds. Applying principles of collateral estoppel, the Court held that the decision reached in *George v. Jackson*, No. 2013 CA 007115 B (D.C. Super. Ct. July 7, 2015), declaring Jericho D.C. the controlling Board as of 2009, compelled the same result with regard to the BOA bank accounts. As a result, Jericho D.C.'s counterclaims alleging BOA mishandling of the accounts necessitated resolution.

Turning to the Counterclaims, the Court denied BOA's motion to dismiss and set a discovery schedule. ECF No. 108. While discovery has been protracted and fraught with difficulty, it has concluded. The parties' cross-motions for summary judgment have been briefed comprehensively and the Court held a hearing. Based on the record evidence, the following facts are undisputed unless otherwise noted.

B.  Factual Background

Betty Peebles and her husband, Reverend James R. Peebles, incorporated the Church in 1962. ECF No. 188-3. After James Peebles' death in 1996, Betty Peebles assumed control over the Board governing the Church, referred to in this opinion as Jericho D.C. Peebles maintained such control uninterrupted until her death in 2010. ECF No. 188-4.

In September and October of 2002, the Church opened two deposit accounts with BOA. In connection with those accounts, the Church granted Betty Peebles authority to enter into agreements with BOA, to "appoint and delegate" others to enter into agreements with the Bank, and to "take any other actions pursuant to such agreements in connection with said accounts that

2

the officer or employee deems necessary." ECF Nos. 188-7, 188-9. Betty Peebles, therefore, retained broad powers to transact business with BOA on behalf of Jericho D.C.

On March 15, 2009, Trustees from Jericho D.C. executed Resolution I-09, which purportedly recognized the Church Board of Trustees to be Betty Peebles, Dorothy Williams, Gloria McClam-MacGruder, Denise Killen, Clarence Jackson, Jennie Jackson, Bruce Landsdowne, Norma Lewis, and Lashonda Terrell. ECF No. 188-23. This Resolution completely changed the composition of the controlling Board, most notably removing Joel Peebles as a Trustee. BOA, however, was unaware of Resolution I-09 until Denise Killen produced it to BOA in October 27, 2010, nearly 18 months after the resolution purported to take effect. ECF No. 189-8. Joel Peebles was equally in the dark. ECF No. 189-22.

On October 19, 2009, Betty Peebles executed several documents which collectively overhauled the Church accounts with BOA. The first, entitled "Deposit Account Documentation Banking Resolution and Certificate of Incumbency," permitted Betty Peebles or Denise Killen (identified as Trustee/Secretary) "acting alone (a) to establish accounts" as well as to "operate and close such accounts" and to "designate persons to operate each such account." ECF No. 188-10. The Certificate plainly states that it "will apply to all accounts you maintain with us." *Id.* The second was an updated signature card that added Killen as a signatory. ECF No. 188-10 at 2. The signature card granted Killen "authority to operate an account," which included "authority to sign checks, and other items and to give us other instructions to withdraw funds; to endorse and deposit checks and other items payable to or belonging to you to the account; and to transact other administrative business related to the account, including closing the account." *Id.* Betty Peebles also authorized Killen to be the "designated account signer" on all BOA accounts

3

associated with the Church. ECF No. 188-20. These documents, in conjunction with the Deposit Agreement, formed the contract between BOA and Jericho DC. ECF No. 188-10.

Prior to the execution of these documents, however, Joel Peebles was granted similar signatory authority on the Church operating account ending in #8458. ECF No. 188-18.[1] The parties vigorously disagree as to whether the documents executed in 2009 removed Joel Peebles as an authorized signatory for this account or simply added Denise Killen as an authorized signatory. Further, the testimony in this respect is less than clear. BOA Regional Executive, Patricia Brooks-Nobles, who was personally involved in the Jericho dispute, testified that she "did not see anything" in the BOA account documents "that deleted Joel Peebles as an authorized signatory for the Church operating account"; however, she also testified that the corporate resolution documents executed in 2009 "supersede[]" the prior signature card, and so it was "unnecessary" for the bank to do anything more to effectuate Joel Peebles' removal as a signatory. ECF No. 189-29 at 18, 39. Further, the 2009 signature card for the operating account, on its face, notes that Killen was added to the account, but nowhere does the card indicate Joel Peebles was "deleted," even though the form of the signature card provides for such notation. ECF No. 188-19 (Deposit Account Documentation Signature Card noting an "update" and "adding" Denise Killen as signatory).

A year after the documents were executed, Betty Peebles died. On November 5, 2010, Joel Peebles wrote BOA expressing thanks for BOA's condolences for his mother's passing and discussing the Church's relationship with BOA. ECF No. 188-24. He further instructed BOA that "as the authorized representative of the governing body of the Jericho Baptist Church

---

[1] At this time, the Bank was Nationsbank, N.A. Betty Peebles had sole signatory authority on all other accounts. ECF Nos 188-19 (account ending in #1589); ECF No. 188-22 (account ending in #0008); ECF No. 188-20 (account ending in #8445).

4

Ministries, Inc. I am the only person authorized to make financial transactions with your bank; that includes drafting checks, money transfers, etc." *Id.* On November 9, 2010, Brooks-Nobles of BOA responded to Joel Peebles in writing, stating that because his assertions contradicted the operative account documents executed on October 9, 2009, the Bank required further documentation to confirm the switch of authority. ECF No. 188-25.

On March 4, 2011, Joel Peebles responded to Brooks Nobles, first alerting her that he had just received her correspondence two days prior because "sadly your communication was intercepted." ECF No. 188-26. Peebles also included for BOA's records "Resolution from the board of directors/trustees which names Joel Peebles as . . . the sole authorized signer for the Jericho Baptist Church Ministries, Inc." and "the only person authorized to make financial transactions with the Bank," as well as Board meeting minutes and organizational documents confirming the same. *Id.* Curiously, this Board resolution was signed by the same individuals who signed Resolution I-09. *Compare id.*, *with* ECF No. 189-8.

Brooks-Nobles concedes that at this time she clearly recognized "that there was a conflict" regarding Church control. ECF No. 189-29 at 23 (acknowledging a draft email which documents a "sincere hope that the church will come to a resolution in the near future. It is not the desire of the bank to be placed *in the middle of this division*.") (emphasis added). BOA had also received a flurry of corroborative correspondence that the two Church factions were embroiled in a series of legal disputes over Church control. BOA had received a subpoena for bank records (ECF No. 188-27); had been warned by attorneys for both the Board of Jericho D.C. and of Jericho M.D. that each regarded its own Board as in control of the funds held with BOA (ECF Nos. 189-12, -23); and BOA had begun internal discussions as to the status of pending litigation that BOA expected would only "get messier before it gets better." ECF Nos.

5

189-17, 189-18. Joel Peebles also carefully laid out the status of such litigation by separate correspondence. ECF No. 189-22; *see also* ECF No. 189-23 (letter from Jericho D.C. attorney Timothy Maloney identifying two separate pending court cases concerning Church control and warning that BOA's continued disbursements to "Dorothy Williams, Denise Killen or anyone working on their behalf" may result in litigation against the Bank).

On September 4, 2011, Jericho D.C. filed suit against BOA on almost identical grounds as those asserted in the current counterclaims pending before this Court. *See Jericho Baptist Church Ministries, Inc. v. Bank of America, N.A.*, 8:11-cv-2618-AW (D. Md. 2011) ("2011 suit"). While the 2011 suit was pending, however, the Circuit Court for Prince George's County, Maryland declared Denise Killen and the other Jericho M.D. Board members to be the lawful Board governing the Church. ECF No. 188-28.[2] Jericho D.C., as a result, voluntarily dismissed the federal suit without prejudice to refile. Then, on September 19, 2012, the Court of Special Appeals of Maryland reversed the Prince George's County Circuit Court's grant of summary judgment and remanded for further proceedings, finding that genuine issues of fact precluded determination as a matter of law as to the Board in rightful control of the Church. ECF No. 188-29. Throughout this time, BOA continued to allow Denise Killen to disburse church funds.

On October 15, 2013, Jericho D.C. filed suit in Superior Court of the District of Columbia, seeking a declaration that it was the Board rightfully in control of the church. ECF No. 188-30. Jericho D.C. more particularly maintained that Resolution I-09 was procured unlawfully and that it, rather than Jericho M.D., was the Board under whose authority the Church

---

[2] In late October 2010, Jericho M.D. had filed suit in Prince George's County Circuit Court seeking declaratory relief. ECF No 188-28. In connection with that litigation, the Circuit Court granted Jericho M.D.'s motion for temporary restraining order on July 15, 2011. *Id.* Although BOA highlighted this restraining order at the hearing, the Court notes the order was narrowly circumscribed to "stop [Joel] Peebles from taking the collection plate and to stop a performance from occurring at the Church facility." *Id.* It had nothing to do with control of BOA account funds, and instead underscored for BOA that the fight for Church control promised to be bitter and protracted.

operated. During this litigation, BOA continued to allow Denise Killen and her associates to disburse church funds.

Two years later, after a three-day bench trial, the D.C. Superior Court invalidated Resolution I-09, and found that the D.C. Board was the lawful church Board as of 2009. ECF No. 188-31. Only after the D.C. Superior Court issued its decision did BOA file an interpleader action with this Court. The interpleader functioned to freeze the BOA bank assets held in the pertinent Church accounts by requiring the funds to be deposited in the Court registry pending resolution of the case. Jericho D.C. filed its counterclaims against BOA for breach of contract, negligence and gross negligence, essentially contending that the bank violated its duty of care to Jericho D.C. by allowing Denise Killen to transact bank business from 2009 until the filing of the interpleader action. The Court examines each counterclaim in turn.

## II. Standard of Review

Summary judgment is appropriate when the court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively

7

that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is likewise warranted. *Celotex*, 477 U.S. at 322.

## III. Analysis

### A. Breach of Contract (Count I)

In the parties' cross motions for summary judgment, each professes victory based on a largely undisputed record. Jericho D.C. contends that the facts construed most favorably to BOA demonstrate that BOA violated its implied contractual duty of due care, while BOA contends no breach—express or implied—occurred in its adherence to the 2009 customer agreement executed by Betty Peebles and Denise Killen. As to BOA's motion, as Jericho D.C. concedes, summary judgment is appropriate as to the breach of express contract claim. Furthermore, and construing the facts most favorably to Jericho D.C., the Court finds that genuine issues of material fact exist at this stage as to whether BOA breached its implied contractual right to exercise ordinary care in the disbursement of bank funds. For the same reasons, and construing the facts most favorably to BOA, the Court denies Jericho D.C.'s motion for summary judgment.

The Court first addresses the breach of express contract claim. It is well settled that "[t]he relationship between a bank and its customer is contractual." *G&D Furniture Holdings Inc. v. SunTrust Bank*, No. TDC-16-2020, 2017 WL 2963350, at *2 (D. Md. July 11, 2017) (citing *Lema v. Bank of America N.A.*, 375 Md. 625, 638 (2003)). A signature card and deposit agreement constitute the operative written contract between the Bank and customer. *Lema*, 375

8

Md. at 638; *Harby ex rel. Brooks v. Wachovia Bank, N.A.*, 172 Md. App. 415, 422 (2007). As to the operative contract, no dispute exists that as of 2009, Betty Peebles retained authority to negotiate contractual terms with BOA on the Church's behalf. It is equally undisputed that Betty Peebles executed a series of documents with BOA that bound both parties to its terms. *Kiley v. First Nat. Bank of Md.*, 102 Md. App. 317 (1995) (stating that authorized party executing new signature cards and agreements to add wife to account "either created a new contract with the Bank or modified their original contract"). Based on these documents, Peebles authorized Denise Killen to transact business with the Bank on the Church's behalf, to include authorizing disbursements of funds held in church accounts. Although at the hearing, Jericho D.C. argued that the manner in which these documents were executed is evidence demonstrating BOA failed to exercise due care, Jericho D.C. also agreed it is not claiming breach of any express contractual provision. Summary judgment on any theory of breach of express contractual terms is thus granted in BOA's favor.

Jericho D.C.'s primary theory of liability, however, is that BOA breached an "implied contractual duty of ordinary care that it owed to its customer, here Jericho D.C." by continuing to disburse funds even after being placed on notice of the fight for control between the two Boards. ECF No. 192 at 18. The implied contractual right for a bank to exercise ordinary care in the disbursement of customer funds "includes an obligation to pay funds only as authorized." *G&D Furniture Holdings*, 2017 WL 2963350, at *3 (quoting *Univ. Nat'l Bank v. Wolfe*, 279 Md. 512, 521 (1977)) (internal quotation marks omitted). A customer may bring a breach of contract claim where a bank has failed to exercise ordinary care in disbursing the depositor's funds. *Gillen v. Md. Nat'l Bank*, 274 Md. 96, 101–102 (1975). Importantly, a bank cannot contract away its obligation to exercise ordinary care. *Id.* Even where express contractual terms have not

9

been broken, the bank still may have violated its implied obligation to exercise due care in disbursing funds. As to the duty a Bank owes to its customers, ordinary care "means observance of the reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." Md. Code, Com. Law § 3-103(a)(7); *see also Schultz v. Bank of Am., N.A.*, 413 Md. 15, 40 (2010)

Jericho D.C. contends that sufficient evidence demonstrating BOA's dereliction of this duty exists to reach the trier of fact because BOA was on notice as early as October 2010 that Killen may not have been duly authorized to act on the Church's behalf. Jericho D.C. more particularly argues that BOA's failure to take any action to preserve the funds in the Church accounts, despite ample actual knowledge of a bona fide dispute as to which faction controlled the Church, violates the Bank's implied contractual duty to exercise ordinary care. The Court agrees.

Viewed in the light most favorable to Jericho D.C., a reasonable finder of fact could determine that BOA breached its duty of ordinary care to Jericho D.C. by allowing Killen to disburse funds in the face of mounting evidence of the Church's internecine war. A reasonable fact-finder could conclude that BOA knew Joel Peebles had been a signatory on the Church operating account, and that the 2009 documents do not, on their face, clearly remove Joel Peebles' authority. Thus, the trier of fact may find probative that BOA gave short shrift to Joel Peebles' claimed authority after Betty Peebles' death, at least with respect to the operating account.

Further, when Betty Peebles died, BOA was immediately notified that Joel Peebles would assume control of the Church, a not altogether unreasonable ascension in light of his longstanding role in the Church. Most critically, Joel Peebles notified the church that he retained

full and exclusive control of the bank accounts, and when asked, provided BOA the requested documents to confirm his representations. BOA also knew of the protracted legal battle the Church factions were waging in multiple courts with differing outcomes. At the same time, attorneys for both Boards continued to contact BOA setting forth each Board's respective position as to which Board retains control of the funds. BOA personnel acknowledged at that time and in connection with this litigation, that the fight for Church control would only get "messier" before it gets better. Despite the mounting evidence of the Boards' legal battles for control, BOA for the next four years allowed Denise Killen to authorize disbursements, in direct contradiction to the documents presented by Joel Peebles. On this record, a reasonable trier of fact *could* find that the Bank failed to exercise ordinary care when it permitted such disbursements after March 2011.

BOA, however, forcefully argues that the Maryland adverse claims statute, as a matter of law, precludes Jericho D.C.'s claim completely. Section 5-306(a) states that,

> (a) Except as provided in subsection (b) of this section, a banking institution is not required to recognize or take any action on any claim to a deposit or to money or property held by it or contained in a safe-deposit box, if that claim is adverse to the interests of any person who, on its records, appears to be entitled to the deposit, money, or property.
>
> (b) If, in an action to which the adverse claimant is a party, a court order or decree involving a claim to the deposit, money, or property is served on the banking institution, the banking institution may or, if required by the court, shall impound the deposit, money, or property, subject to further order of the court, without any liability on its part to anyone for doing so.

Md. Code, Fin. Inst. § 5-306. This statute is designed to provide to banks certainty in proceeding when presented with third-party claims to account funds. *Parkville Fed. Sav. Bank v. Md. Nat'l Bank*, 343 Md. 412, 422 & n.5 (1996).

BOA contends that because the statute states that a bank is "not required to recognize or take any action on any claim to a deposit . . . if that claim is adverse to the interests of any person who, *on its records*, appears to be entitled to the deposit, money, or property," then legally it cannot be held liable even if the Bank's choice not to act constitutes a failure to exercise ordinary care. *See* Md. Code, Fin. Inst. § 5-306(a) (emphasis added). The Court is not convinced, and BOA has provided no authority, to support that this statute vitiates the common law implied duty of ordinary care as applied to this case. To read the statute as BOA suggests would effectively immunize the Bank from suit so long as its conduct is consistent with some documents in its possession.

The fallacy of this contention is made plain by first focusing on the term "records" in the statute. BOA contends that the statute applies here because Jericho D.C.'s "claim" to the bank deposit funds was "adverse" to the interests of the Board as represented by Resolution I-09, and the corresponding bank documents executed by Denise Killen and Betty Peebles. However, also in the Bank's "records" was the previous signature card authorizing Joel Peebles to negotiate the Church operating account, as well as the Board resolution and meeting minutes reflecting that Joel Peebles retained sole authority to transact business on the account. Because this Court cannot, as a matter of law, pick and choose which "records" fall within the ambit of the adverse claims statute, the Court likewise cannot find Jericho D.C.'s claim "adverse." Put differently, this statute is simply not applicable where two warring factions of an entity, each claiming control of the entity and thus its bank account funds, present for the Bank "records" proof that each is rightfully in control. Indeed, in none of the authority cited by BOA or found by the Court was an "adverse" claimant also a signatory on the account, rather than a third-party. The adverse

claims statute, therefore, does not bar this suit. Summary judgment is denied on the implied contractual claim.

The Court's determination is not without limits, however. This decision is contingent on whether the Court permits Jericho D.C.'s "expert" analysis of Susan Riley to be admitted at trial. The Court is mindful that, pursuant to *Schultz v. Bank of America, N.A.*, 413 Md. 15, 19 (2010), Jericho D.C. may very well not be able to meet its evidentiary burden on whether the bank violated industry standards of "ordinary care." *Id.* As in *Schultz*, expert testimony appears "necessary to establish the standard of care" in the banking industry with respect to the execution of the new resolutions and signature cards in 2009 and the propriety of allowing Killen to authorize disbursements while the war between the Boards waged on. *Id.* at 27.

As the Court discussed with the parties during the hearing, the Court is skeptical that Riley is qualified to testify as an expert in the banking industry, and if even she is qualified, that her opinions lack sufficient evidentiary basis. BOA challenges the admissibility of Riley's opinions, albeit indirectly. ECF No. 193 at 16. The Court, therefore, will permit BOA to move to strike Riley as an expert, the outcome of which may further narrow or eliminate the vitality of Jericho D.C.'s claims altogether.[3] However, at present the Court is obligated to draw all inferences in favor of Jericho D.C. as the nonmoving party, and so is not prepared to grant summary judgment in BOA's favor. This is especially so given the unique constellation of circumstances—two competing Boards claiming power over the Church, spawning multiple lawsuits concerning Church control, each at different points emerging victorious. A reasonable trier of fact could find that BOA failed to exercise ordinary care in simply allowing disbursement

---

[3] The parties noted at the hearing the protracted discovery disputes had impacted BOA's ability to depose Ms. Riley. The parties agreed that BOA will depose Riley by the end of March 2019, at which time the Court will set a briefing schedule on BOA's motion to exclude.

13

of funds at the behest of Killen and Jericho M.D. representatives. The parties' cross-motions for summary judgment as to the breach of the implied contract claim are denied, subject to this Court revisiting the claim after the Court has resolved BOA's motion to exclude Riley.

### B. Negligence and Gross Negligence (Counts II and III)

For similar reasons, the Court cannot grant summary judgment on the negligence claims. To prove negligence under Maryland law, a plaintiff must demonstrate that: (1) the defendant was under a duty to protect the plaintiff from injury; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury or loss; and (4) the loss or injury proximately resulted from the defendant's breach of the duty. *Valentine v. On Target, Inc.*, 353 Md. 544, 549 (1999). Maryland courts have defined gross negligence as:

> [A]n intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Romanesk v. Rose*, 248 Md. 420, 423 (1968) (quoting 4 Blashfield, Cyclopedia of Automobile Law and Practice § 2771 (1946 ed.)); *see also Liscombe v. Potomac Edison Co.*, 303 Md. 619, 634–37 (1985).

A bank customer may bring a negligence suit where the bank wrongfully disburses its customer's funds in a manner that violates the duty of ordinary care. *Schultz*, 413 Md. at 28 ("A bank customer may bring a negligence suit against a bank for a violation of this duty of ordinary care."); *see also Taylor v. Equitable Tr. Co.*, 269 Md. 149, 155–56 (1973). Whether the bank "was negligent in paying an item, that is, whether the bank paid the item in accordance with reasonable commercial standards is one which must be decided upon the facts of each particular

14

case." *Bank of S. Maryland v. Robertson's Crab House, Inc.*, 39 Md. App. 707, 714 (1978) (citations omitted) (citing Md. Code, Com. Law §§ 3-406, 4-406; *Dominion Constr., Inc. v. First Nat'l Bank of Md.*, 271 Md. 154, 166 (1974)). "[W]hat constitutes a negligent payment," is based on the "special circumstances that characterize each separate case," and is thus "one of fact for the jury if the evidence is conflicting." *Commonwealth Bank of Balt. v. Goodman*, 97 A. 1005, 1008 (1916) (quoting 3 Ruling Case Law 709).

The difference between negligence and gross negligence is one of degree, and thus is also quintessentially a question of fact. *Artis v. Cyphers*, 100 Md. App. 633, 652 (1994) ("[U]nless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence."); *see also Romanesk*, 248 Md. at 424–25 (holding that whether operation of motor vehicle under existing conditions was grossly negligent was question for jury).

Based on the same factual predicate, the Court discerns no meaningful difference between the evidence supporting BOA's breach of its implied contractual duty of due care, and the due care sounding in negligence.[4] BOA contends, however, that summary judgment must be granted in its favor because the negligence claims are barred by the economic loss doctrine. The economic loss doctrine recognizes that "[a] contractual obligation, by itself, does not create a tort duty"; tort claims must allege a duty of care arising independent of the contractual relationship. *Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 253 (1999). This rule safeguards the "bedrock principle" that damages stemming from a contract dispute are limited to those contemplated by the parties at the time of the creation of the contract. *City of Richmond, Va. v. Madison Mgmt.*

---

[4] Contributory negligence is not an available defense to BOA because "no amount of negligence on [the customer's part] ought to relieve the bank of its duty to use ordinary care." *Goodman*, 97 A. at 1009; *see also Robertson's Crab House*, 39 Md. App. at 722–24.

15

*Grp., Inc.,* 918 F.2d 438, 446 (4th Cir. 1990); *see also Rotorex Co. v. Kingsbury Corp.*, 42 F. Supp. 2d 563, 575 (D. Md. 1999) (holding that when sophisticated parties enter into a commercial transaction, their damages are limited to the ones contemplated in the contract).

The economic loss rule cannot bar suit here. In determining whether to apply the economic loss rule, the Court considers (1) "the nature of the harm likely to result from a failure to exercise due care" and (2) "the relationship that exists between the parties." *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534 (1986). The nature of the harm in this case does not arise from BOA's breach of an *express* contractual provision. Rather, it stems from its breach of the implied duty of care arising from the relationship between the bank and its customers. This harm squarely sounds in negligence as well as implied contractual duties. *See Schultz*, 415 Md. at 28; *Honeycutt v. Honeycutt*, 150 Md. App. 604 (2003) (suit sounding in both contract and negligence concerning unauthorized disbursements). The nature of the relationship between the parties—depositor and bank—has time and again given rise to negligence claims where the only loss is money. This likely is so because the relationship gives rise to an implied duty that the Bank must exercise due care in allowing disbursements. Thus, based on the facts viewed most favorably to Jericho D.C., the economic loss doctrine does not bar Jericho's claims from proceeding to trial. However, as with the implied contract claim, the Court may revisit this decision if Jericho D.C.'s expert on banking industry standard of care is excluded.

**C. Punitive Damages**

Lastly, BOA argues that Jericho cannot pursue punitive damages. To recover punitive damages in any tort action, the plaintiff must marshal "facts sufficient to show *actual malice* must be pleaded and proven by clear and convincing evidence." *Scott v. Jenkins*, 345 Md. 21, 29 (1997) (emphasis in original). Actual malice means "'evil motive, intent to injure, ill will, or

16

fraud.'" *Id.* at 31 (quoting *Owens–Illinois v. Zenobia*, 325 Md. 420, 460 (1992)). The evidence, construed most favorably to Jericho D.C., simply does not support that BOA acted intentionally to harm Jericho D.C., or with ill will, or bad motive. Accordingly, Jericho D.C. will not be permitted to seek punitive damages at trial.

**V.     Conclusion**

For the foregoing reasons, Counter-Defendant Bank of America, N.A.'s motion for summary judgment is granted in part and denied in part (ECF No. 188) and Counter-Plaintiff Jericho Baptist Church Ministries, Inc.'s motion for summary judgment is denied. ECF No. 189. A separate Order follows.

2/8/2019_____  \_\_\_/S/_____
Date                                                                    Paula Xinis
                                                                        United States District Judge